of Revision, and the court will proceed to the sixth case, de Lima Silva v. Wisconsin. Mr. Reinhardt? Good morning. Good morning. We've got five minutes to go, so that's it. I said we've got five minutes to go, so that's the right greeting. That is. I got one thing right today, that's good. This is a case about discriminatory discipline and pretext. In this case, there were two directly comparable correctional officers who were both alleged to have engaged in excessive use of force. My client, Mr. de Lima Silva, who is a Latino from Brazil, was terminated for engaging in force. Mr. Corte, who is a Caucasian, received a one-day suspension. So the question is, why the difference in treatment? Because this is a discriminatory discipline case. The decision-maker in this case, Warden Champagne, flat-out lied about the reasons for the difference in treatment. And she was caught in the lie, resulting in subsequent litigation, and as time progressed in an ever-moving and changing explanation for why she treated one way and one other way. In addition, in this case, the Department of Corrections had its own internal express policy that said, you need to have consistent discipline for people who engage in similar offenses. In fact, and I'll get into this a little later, the Department of Corrections did its own proposed in a consistent way, and the decision-makers entirely disregarded that analysis. So the major issues in this case, the first major issue is similarly situated. I contend that in the evidence in the record, a reasonable jury could conclude that Mr. Corte and Mr. de Lima Silva were similarly situated. They worked at the same institution. They had the same position. They had the same chain of command. Their offenses occurred within one month of each other. They had the same decision-makers. Judge Connolly took a different view on similarly situated. He decided that they weren't similarly situated because Mr. Corte did not engage in an excessive use of force, or not accused of engaging in excessive use of force. The record indicates otherwise, and I will point you to three places in the record that indicates that Mr. Corte was alleged to have engaged in excessive use of force. First, Warden Champagne herself testified that she viewed this as a use of force violation. Secondly, in discovery, the DOC was asked to identify those people who had been alleged to have engaged in an excessive use of force and not been terminated for that, and Mr. Corte was identified. Third, the actual documents relating to the Corte investigation have the POSC manual 30607 identified in what he was accused to have violated, which is use of force, and Rule 11, he was found to have violated, which relates to bodily injury, either actual or threatened. So Judge Connolly's statement in his opinion that Mr. Corte was not comparable because he was not alleged to have engaged in the use of force is contrary to the record. The second thing that Judge Connolly focused on in finding or determining that these two gentlemen were not similarly situated was an allegation of falsification, and I'll talk briefly about that. It's ironic that Mr. Lima-Silva was accused of engaging in falsification when Mr. Corte was not, because Mr. Corte never raised the issue during his investigation of what he did with the inmate. What he did, by the way, with the inmate is he pushed him into the wall, Mr. Corte that is, pushed him into the wall several times, grabbed the inmate by the head with both hands, and shook the inmate's head. During the investigation, Mr. Corte unbelievably said, I don't have any recollection of doing that. He was not accused of engaging in falsification or misleading the investigators. Mr. Lima-Silva, on the other hand, was. But there's more than that because there was another person involved in the Lima-Silva incident, his name was Sergeant Fulton, and the investigators found that his recitation of the events given to the investigators, Sergeant Fulton's that was, was also inconsistent with the video. They actually lumped him and Mr. Lima-Silva together. Mr. Fulton was not accused of falsification. Did the video contradict Lima-Silva's claim that he assumed, that the inmate had assumed a boxing position, kind of crouched down? Well, it depends how you define the boxing position. I don't know if you folks watched the video, but it's in a dimly lit room. It's hard to see. We contend it does, especially if you slow it down, because it's, the inmate raised his arms abruptly. And the question is, was that the boxing position, or do your arms have to be up like this? And we contend the video supports the position. If you look in the record, everyone who looked at the video had entirely different views of what the video showed. I thought just one person did, right? No, there were, if you look in the record, there's like the people who were involved in the investigation, the warden, and then the use of force reviewers, they all saw different things. Some, the people who conducted the investigation of D. Lima-Silva said the inmate stood at the position of attention the whole time and never changed position. The use of force investigator said the inmate looked backwards, which can be called the But didn't everybody besides the ALJ conclude that he had used excessive force? Yes. Okay. But there's two issues in this case. One was the finding that they engaged in excessive use of force pre-textual, but the more important question I think for purpose of this appeal is whether or not the difference in discipline for these two similarly situated people was pre-textual. And so that leads me to the pre-text issue, which in our brief we set forth the four or five different shifting reasons. The first reason given by Warden Champagne for the different and more lenient treatment of Mr. Corte was that he reported the incident to the supervisor initially, he filled out an incident report, and he offered medical assistance. Ironically, he did none of those things. Those were the things that D. Lima-Silva did. So there was a hearing before the Wisconsin Employment Relations Commission, and the judge, perhaps because the judge said that Warden Champagne's explanation for the difference in treatment was transparently false, nonsensical, and less than convincing, those were the words of that judge. Then there was a change in this federal case to say, well, Mr. Corte apologized or acknowledged wrongdoing, and the use of force for Mr. Corte was different, not serious, I think the words were not violent or excessive. So that didn't come up for the first time until this federal case, two or three years after the original reasons were given that were proven at the work proceeding to be false and untrue. So that's the first issue with pretext. The second issue with pretext is the policy regarding consistent discipline. The law is clear in this circuit that this court can, in the event of shifting or inconsistent reasons, find that that constitutes pretext. I'm sorry, that a failure to follow your own policies can constitute evidence of pretext. In this case, they didn't follow the policy. The evidence is in the record that they had to look and compare and say, hey, we're talking about terminating this guy. Has anyone been terminated for engaging in a similar offense? They did the research and went back 10 years. Nobody had been terminated for a decentralization. Nobody. In fact, the evidence was that there were a number of people who had engaged in much more serious conduct, hitting, punching, kicking, and they hadn't been terminated. That information was presented to the decision maker and they chose to entirely disregard it. Mr. Reiner, what do you make of the Champaign deposition in March where there's an attempt to explain the differences or the evolving assessment that was made earlier? I think she was caught in a lie and she had to come up with a new explanation. Now I will say that the other side's explanation is, well, she was mistaken. Well, there's no evidence in the record at all, zero, that she was mistaken. I'll give you two minutes for rebuttal. Okay, thank you. I didn't mean to cut you off. No, no, no. Because I suspect I'll address the mistake argument when I come back for rebuttal. Thank you, Mr. Reiner. Mr. Kilpatrick. Good afternoon, your honors. May it please the court. This is an employment discrimination case for sure, but it was easily and correctly decided by the district court. Plaintiff Julio de Lima Silva had the burden of proof. He was required to put forth enough evidence at summary judgment that would allow a reasonable jury to find that my client, the Department of Corrections and their employees, discriminated against him based on race and national origin. Or put another way, he was required to put forth enough evidence to convince a reasonable juror that he would have kept his job had his race or ethnicity been different, everything else had remained the same. He has failed to meet that burden. Mr. Kilpatrick, let me ask you just to focus on one thing. Sure. Okay. And that is, we have these couple of decisions from the Wisconsin Employment Relations Commission, correct? Yes. And one of those decisions, as Mr. Reinhart points out, has some pretty tough language with respect to the comparator. And what it thought of the comparator case. Now, to be sure, it's deciding a different issue. I understand that. But in light of the commission's statement that the explanation for the difference in treatment was nonsensical, et cetera, et cetera. Why isn't that alone enough at summary judgment, when we have to view the facts in the light most favorable to the plaintiff to send the case to trial? I may have anticipated that. I'm not talking about like the preclusion issue or anything like that. Just that you have a state agency here, the commission, who has looked at evidence and I think we have to trust they did it in good faith. Right. I believe that the first answer is that these were not similarly situated employees. Yes, they were both prison guards. But Mr. De Lima Silva used the decentralization technique to take an inmate to the ground and it was believed to be unprovoked. And everybody who watched the video said it was an excessive use of force and a violation of the use of force policy. On the other hand, Terry Corte did not use decentralization. Yes, he did place his hands on the inmate and that throughout the investigatory paperwork documents, it continued to use the phrase placing of the hands and placing hands on the face. Completely different techniques. He, Mr. Corte, was in violation of the principles of subject control policy, which is different than the use of force policy. Only Mr. De Lima Silva had violated the use of force policy. And that was the policy that says you may use non-deadly force only if you believe that there is an immediate threat to yourself or others of bodily harm. I think Mr. Reinhart made a different point. I think he was pointing to, and you might just disagree with what the record says, but he was pointing to other things in the record that said, hold on, the Corte case too was about excessive force. Right, and thank you for raising that. I think that term has been used a little loosely in this case. And the reason is that it is vaguely a generic term. And that's why I wanted to point out that nowhere in the disciplinary letter of Mr. Corte was that term ever used, excessive force. In Mr. De Lima Silva's termination letter, there was the term excessive force. In addition, in the termination letter and in the investigatory documents for Mr. De Lima Silva, the use of force policy was referenced. Never for Mr. Corte was a use of force policy violation referenced. In addition, never was the falsification work rule cited in Mr. Corte's situation, but it was in Mr. De Lima Silva. So those are things that we believe are enough not to make these two similarly situated employees. They were different using of the hands versus by Mr. Corte by using decentralization force to take an inmate to the ground, in addition to the falsification. That was with regard to the follow-up of the investigation afterwards. Mr. Corte seemed to be contrite and understood what he had done wrong in that investigation post-incident. Mr. De Lima Silva, on the other hand, did not. Counsel, let me ask you a question about your 11th Amendment defense as to the Department of Corrections. You did not raise that in the district court, correct? That was not raised in the district court. That is correct, Your Honor. And in briefing, I believe, made the argument that it's something that... You did, but I'm wondering why you didn't waive it by engaging in the litigation. Well, engaging in the litigation because there were other claims that were brought. So, for instance, we did defend the Title VII claim, and there is no 11th Amendment immunity for that. But you engaged in litigation with respect to the 1983 as well. Right, right. But I guess I would point out for that that it may be irrelevant because still there is no... State of Wisconsin is still not a person under 1983 for the purposes of the 1983 claim. And that was raised by the state. Also, with regard to the 1983 claims, I believe the qualified immunity defense would certainly apply to the individual defendant's appellees. To date, the other side has pointed to no... I don't understand that, actually, because it seems to me that folds into the question of whether they discriminated because discriminating on the basis of race is... I mean, it's a pretty clearly established law prohibiting that. That is true, but the U.S. Supreme Court has stated that the facts, the circumstances of the case must be particularized. And it simply can't be that they knew that discrimination based on race was incorrect. You have to put the individual defendants and appellees in the position they were at back in 2014. Were there any cases that would have put them on notice that what they were going to do, recommend termination of... Fire someone. I mean, if we assume that what the plaintiff has alleged is true, you're really taking the position that they would not have been on notice that firing someone on the basis of race was unconstitutional? Not at all. That's what I'm saying. Because I'm saying back then, how would they have known that what their decisions were, meaning firing and recommending firing, would have been discrimination based on race, discrimination based on national origin. None of them, there's any... You have to accept their version of facts, though. If you accept their version of the facts, what you're saying makes complete sense. If you accept Mr. Reinhart's version of the facts, then I think what Judge Barrett is saying is you are squarely in the territory of unlawful discrimination. Right, but at that point, all that was before them was that their belief, their honest belief, was there were not similarly situated employees. But right, you're arguing the merits. According to you, right, not according to him. Yeah, you're arguing the merits. You're saying there was no discrimination and he hasn't carried his burden of showing it. But if he's carried the burden, I think I'm just perplexed why you think there could be qualified immunity. Well, I don't believe that he has carried his burden. Well, I understand that, but your qualified immunity argument is a different... Your qualified immunity argument is saying that even if they discriminated, that wasn't a violation of clearly established law. Okay, I understand where you're coming from and maybe it wasn't the best argument. But hopefully that the 1983 claims don't have to be reached because the overarching argument here and the defense would apply to all claims going forward that there were no similarly situated persons, Corte and DeLima Silva. There was no pretext what Mr. DeLima Silva's counsel has pointed to. Mr. Kilpatrick, what are we to do with this evolving, what you call mistaken assessments by Chamdane? Don't worry about the time. Sure. What I would propose, your honor, is that you look at the termination letter. Look at the termination letter, which the warden Chamdane has not backed down from. In that termination letter and comparing the termination letter to the disciplinary letter of Mr. Corte, they are completely different. Again, the use of force policy violation was never mentioned in Mr. Corte's disciplinary letter. Excessive force term was never mentioned. Falsification was never mentioned. So we don't have at the beginning, at the basis of this, two similarly situated employees. And furthermore, with regard to pretext, we don't believe that the other side has proven these legitimate reasons to be false. Everyone who viewed the video believed that he had used, Mr. DeLima Silva, excessive force and violated the use of force policy. So those are legitimate reasons to terminate his employment. Can I, Judge, can I ask him one question? Of course. Here's what I find. When you say look at the termination letter, I think your adversary is going to say, well, of course we can look at the termination letter. The whole point of the case is it's bogus. Those aren't the real reasons. So you're right that there's no question. You're right that the termination letter says within its four corners what you describe, right? But I think isn't the whole pretext inquiry that that's all phony? And what, you know, and that, so I don't, I don't know how you overcome the pretext challenges by saying, well, look at the letter. The letter says, the letter has non-discriminatory reasons in it. Because the, if I may answer, the letter, Your Honor, I believe follows what all ten Department of Correction employees decided after viewing the video, that he had used excessive force in the decentralization in the incident of the inmate. And I note that Corte's involvement is irrelevant to that decision. That decision to terminate Mr. De Limasolo's employment, based on what it believed were violation of work rules, violation, use of force, falsification, those did not involve Corte. So there's no comparison to that. So again, that was the department's legitimate non-discriminatory reasons. And I don't believe that the other side has proven those to be false. Thank you, Your Honor. Thank you, Mr. Kilpatrick. Mr. Reinhart. And the, the, the department's choices about what it put in the letter go to the heart of the issue, which is the more favorable treatment of the Caucasian versus the Latino. They chose not to put those things in. But, if they were acting in an unbiased and impartial way, they would have. I, I come back to this allegation that what Mr. Corte did was not a use of force. And we have in the record the, the Chad Anderson, who did the investigation, writes in his incident report, Sergeant Corte grabs inmate Martin and pushes him against the wall several times. Then grabs his head with his hands and starts to shake inmate Martin's head. As my wife pointed out to me the other day, what's more dangerous, decentralizing somebody in a controlled way or grabbing somebody's head and shaking them? They're, they're just different, they're, they're, they're both excessive uses of force. He also says that there's nothing about excessive use of force in the letter. And I agree. And that's the question. Why isn't there? Why doesn't that letter say anything with respect to Corte about excessive use of force? Why doesn't it say anything about falsification? Because he's being treated in a more favorable manner. Just like him being, Mr. Corte being advised to write a letter of apology to to the warden. What happened with Mr. Lima Silva? Nobody made that suggestion. Again, an incident of more favorable treatment. The other thing I want to say is just on the provocation. In, in Warden Champagne's fourth or fifth iteration of the reasons for the difference in treatment, she said, well, there was provocation for Mr. Corte doing what he did, but not Mr. Lima Silva. And I just want to mention this. What was the provocation for Mr. Corte? The inmate was not standing at the, at, at a position of attention, and the inmate was smirking or laughing. Contrast that, and I'll just finish this thought, contrast that with Mr. Lima Silva in a darkly lit room with an inmate who had been disruptive and concerned based upon the inmate's words and actions in terms of getting in a fight in a dimly lit room. Thank you. Thanks, Your Honor. Thank you, Mr. Caputo. The case is taken under advisement and the court will stand in recess.